## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
### The Honorable Michael E. Romero

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 10-34729 MER |
| CONTENT DISTRIBUTING, INC., | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| JEANNE Y. JAGOW, TRUSTEE | ) | Adversary No. 10-1782 MER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GEF SERVICES, LLC, et al., | ) | |
| | ) | Signed/Docketed |
| Defendants. | ) | November 2, 2011 |

### ORDER

THIS MATTER comes before the Court on the *Motion to Modify Preliminary Injunction With Certificate of Conference* (Docket No. 98) (the "Motion") filed by Plaintiff Jeanne Y. Jagow, Chapter 7 Trustee ("Jagow"), and the Responses filed by Falan Funding Corporation ("Falan"), Robert E. Alpert ("Alpert") and GEF Services, Inc. ("GEF"). Based on the evidence and legal arguments presented by the parties at trial, the Court hereby makes the following findings of fact and conclusions of law.

### JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(F) and (H), as it deals with the avoidance of preferences and the recovery of fraudulent transfers.

### BACKGROUND FACTS

John W. Scherer ("Scherer") formed and organized Content Distributing, Inc. (the "Debtor"), as a Colorado corporation. At all relevant times, Scherer was the CEO of the Debtor. According to the parties' stipulated facts, on March 24, 2010, GEF and the Debtor entered into a Purchase and Sale of Future Receivables Agreement (the "Agreement"), pursuant to which GEF provided funding to the Debtor in the principal amount of $1,600,000. To secure the performance of the Agreement, the Debtor granted GEF a priority security interest in all of the Debtor's assets, including intellectual property, technology, software programming and applications, patents, trademarks, trade names, etc., computer applications software, goodwill,

CD-ROM inventory and other product inventory, all tangible personal property, all agreements, leases and contracts, all governmental licenses, permits, etc. and all business records, customer lists and advertising materials (the "Debtor's Assets").  A dispute arose, and the Debtor filed an action against GEF in the Arapahoe County District Court, and sought alternative funding for its operations.  During the course of the Arapahoe County case, Scherer met Robert Alpert ("Alpert"), who proposed to form a new entity, acquire the secured interest of GEF for approximately $1.1 million, and develop a plan to resolve the Debtor's creditors' claims outside of bankruptcy.

On June 8, 2010, Falan, an entity controlled by Alpert, and GEF entered into a letter agreement providing Falan would acquire from GEF all of the Debtor's Assets that had been pledged to GEF, excluding real property, related to the operation of the Debtor's business, cash or cash equivalents and accounts receivable.  A letter agreement between Falan, the Debtor, and Scherer dated June 11, 2010, also acknowledged Falan would acquire such assets from GEF.  Specifically, Falan would obtain the Debtor's Assets from GEF after GEF exercised its rights as a secured creditor and achieved ownership of the assets in a "friendly foreclosure" under Article 9 of the Colorado Uniform Commercial Code.

Falan agreed to pay GEF a total of $1,450,000 for the Debtor's Assets.  Falan secured payment for the purchase from GEF with a first lien on the assets.  In addition, a letter agreement dated June 11, 2010, between Falan and the Debtor provided that after Falan acquired the Debtor's assets from GEF, Falan would pay up to $170,000 of the Debtor's past-due liabilities to its existing employees on the earlier of either (i) the date the Debtor's liabilities to unsecured trade creditors were settled or (ii) 120 days after closing.  On July 7, 2010, documents were executed pursuant to which Falan acquired the Debtor's Assets, excluding its real property.

## PROCEDURAL BACKGROUND

On September 29, 2010, the Debtor filed its voluntary Chapter 7 petition.  Jagow was appointed Chapter 7 Trustee.  Jagow filed the instant adversary proceeding on October 26, 2010, seeking recovery of fraudulent transfers under 11 U.S.C. § 548.[1]  On that same date, the Court granted Jagow's motion for a temporary restraining order against the Defendants to prevent the sale of assets transferred prepetition.  On November 22, 2010, the Court converted the temporary restraining order to a preliminary injunction to remain in effect until the conclusion of the trial and the entry of a final order (the "Preliminary Injunction").

Jagow's initial Complaint alleged the assets pledged to GEF, as of June 11, 2010, had a combined depreciated value exceeding $7.4 million.  The Complaint contained the following claims for relief:  1) recovery of the transfers to GEF and Falan as fraudulent transfers pursuant to § 548(a); 2) recovery of the transfers as state law fraudulent transfers under COLO. REV. STAT. §§ 38-8-105 and 38-8-105 and § 544(b)(1); 3) recovery of the transfers to GEF as a preference

---

[1] Unless otherwise noted, all future statutory references in the text are to Title 11 of the United States Code.

under § 547(b); 4) recovery of the transfers from GEF and Falan as initial transferees, entities for whose benefit the transfers were made, or immediate or mediate transferees, pursuant to § 550; and 5) disallowance of any claims of GEF and Falan against the estate unless the transfers were recovered, pursuant to § 502(d).

Thereafter, Falan filed its Answer and a Cross-Claim against GEF. GEF responded by filing its Third Party Complaint against Scherer. At the request of the parties, the Court entered orders staying the pending motions in the adversary proceeding in light of settlement discussions. On March 7, 2011, GEF and Scherer filed a stipulation for the dismissal of the Third Party Complaint, and the stipulation was approved on March 11, 2011.

On March 17, 2011, the Court granted Jagow's motion to amend her Complaint. Jagow subsequently filed a Second Amended Complaint to which she added as defendants Alpert individually, as well as John and Jane Does 1 through X, ABC Corporations 1 through X, and XYZ Partnerships 1 through X. The Second Amended Complaint alleges Alpert made misrepresentations to Scherer, and controlled the Debtor's operations and assets with the intent to deprive the Debtor of the assets and the revenue they generated.

According to the Second Amended Complaint, Falan removed most of the Debtor's furniture, computers, servers, and office equipment from the Debtor's Lakewood office building after July 7, 2010, and is storing the items in Arizona. Further, Jagow states Falan has asserted ownership of a generator worth $250,000 installed in the Lakewood office building. The Second Amended Complaint goes on to allege Alpert told Scherer that he could no longer be part of the Debtor's business and would not receive an equity interest in a new company, as Scherer had been promised. According to Jagow, the Debtor's assets included approximately 100,000 CD-ROM discs, approximately 2000 of which have been sold at around one-quarter of their original selling price, and at least some of which were sold after the entry of the temporary restraining order and preliminary injunction.

The Second Amended Complaint also contains allegations about numerous legal actions pending against Alpert. She also states Alpert controls approximately eighty entities. Jagow contends Alpert and Falan did not have the financial resources to perform their agreements with the Debtor, and misrepresented their financial position to the Debtor and Scherer. In addition, she asserts Alpert has formed another entity, Learn Online Direct, Inc. ("Learn Online"), which is engaged in the same business as the Debtor, and is using the Debtor's assets to build its own business.

In addition to the five claims for relief set forth in the original Complaint, the Second Amended Complaint contains the following claims for relief: 6) against Alpert and Falan for damages caused by their false representations, negligent misrepresentations, or fraud; 7) against Alpert and Falan for civil theft pursuant to COLO. REV. STAT. § 18-4-401; 8) against Alpert and Falan for fraud committed in inducing the Debtor and Scherer to enter into agreements with them; and 9) for declaratory judgment that Learn Online's assets are derived directly from the Debtor's assets and are, in fact, the Debtor's assets, entitling the estate to recover all revenues

generated by Learn Online. GEF filed an Answer to the Second Amended Complaint on April 5, 2011, and Alpert and Falan filed their Answer and Cross-Claim against GEF on April 27, 2011.[2] Alpert and Falan also filed a motion to dismiss the sixth, seventh, and eighth claims for relief.

Jagow filed the Third Amended Complaint on May 31, 2011, asserting additional allegations about Learn Online. Specifically, the Third Amended Complaint adds as a defendant Danro Corporation ("Danro"), and asserts it is controlled by Alpert. According to the Third Amended Complaint, on November 2, 2010, Danro bought from Falan the domain name videoprofessoronline.com without disclosing the transfer to the Court or to Jagow. Further, after Falan acquired the Debtor's assets, Danro bought the name Learn Online Direct, and is conducting business through a website called learnonlinedirect.com, which directs visitors to videoprofessoronline.com, which in turn markets and sells Video Professor products. Jagow also alleges Alpert and Falan have formed an entity called Online Professor, Inc., which is also selling Video Professor products online. The Third Amended Complaint amends the ninth claim for relief to request a finding any revenues generated by both Learn Online and Online Professor are property of the estate that may be recovered by Jagow, and a finding that, to the extent any transfer of the Debtor's assets, including the transfer of the domain videoprofessoronline.com, occurred after the entry of the temporary restraining order on October 26, 2010, she is entitled to judgment finding Falan in contempt and an avoidance of such transfers. GEF filed an Answer to the Third Amended Complaint on June 13, 2011, and Alpert and Falan filed their Answer and a cross-claim against GEF on June 16, 2011.[3]

## MOTION TO MODIFY PRELIMINARY INJUNCTION

According to Jagow's current Motion, the Preliminary Injunction now in place requires Falan to deliver all proceeds from the sales of the Debtor's CD-ROM inventory after October 26, 2010, to Falan's counsel for deposit in a segregated, interest-bearing trust account for the benefit of the estate pending resolution of the claims in the adversary proceeding. Jagow contends none of the deposits have been placed in such an account. She notes the Preliminary Injunction also prohibits Falan from selling or otherwise disposing of the Debtor's personal property, acquired by Falan on or about July 7, 2010.

Based on her review of bank records provided by Falan, Jagow asserts Falan continues to dissipate the revenues generated from the Debtor's assets, and the estate is being irreparably harmed. Jagow requests the Court expand the original preliminary injunction to require Falan to deliver all gross revenues generated from the Debtor's assets to Jagow's counsel for deposit in a segregated, interest-bearing trust account for the benefit of the estate, pending resolution of the Jagow's claims in this adversary proceeding. In addition, she seeks a finding the Defendants have violated the original Preliminary Injunction, and an order directing the Defendants to 1) disclose each transaction involving the Debtor's assets, and 2) produce all documents and

---

[2] GEF filed an Answer to this Cross-Claim on May 11, 2011.

[3] GEF filed an Answer to this Cross-Claim on June 24, 2011.

information that evidence, concern or relate in any way to gross revenues generated by or from the Debtor's assets.

## DISCUSSION

To obtain preliminary injunctive relief, or in this case, additional preliminary injunctive relief, a movant must show the following: 1) the movant is likely to succeed on the merits at trial; 2) the movant will likely suffer irreparable harm in the absence of such relief; 3) the equities weigh in favor of the movant; and 4) injunctive relief is in the public interest.[4] A preliminary injunction is an extraordinary remedy, and courts must balance the claims of the parties and consider the effect of the injunction on each party.[5] "'[T]he limited purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.'"[6]

### A. Likelihood of Success on the Merits

In her Motion, Jagow argues the Defendants gave less than equivalent value for the Debtor's assets. She also states Alpert, through Falan and other entities, used the Video Professor brand and the Video Professor content without segregating the funds, and so has violated the Preliminary Injunction and impaired the value of the Debtor's assets that may be recovered for creditors.

The testimony of the witnesses and the exhibits show both "hard assets" and intellectual property assets were transferred.[7] The "hard assets" consist primarily of equipment, furniture, and an inventory of CD-ROMS.[8]

---

[4] *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Kansas Judicial Watch v. Stout*, ___F.3d___, 2011 WL 3455820, at *2 (10th Cir. Aug. 9,2011); *In re Rare*, LLC, 298 B.R. 762, 763 (Bankr. D. Colo. 2003).

[5] *Munaf v. Geren*, 553 U.S. 674, 689-690 (2008); *Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987).

[6] *Schrier v. University of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quoting *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

[7] *See* Jagow Exhibit 5, Letter Agreement of June 8, 2010 between GEF and Falan (also Falan Exhibit T); Jagow Exhibit 7, Purchase and Sale of Future Receivables Agreement between Debtor and GEF, dated March 24, 2010 (also Falan Exhibit C). However, no real property was transferred to GEF or Falan by the Debtor.

[8] *See* Falan Exhibit S, Asset Schedule Presented by Content Distributing, Inc. on June 9, 2010; Jagow Exhibit 5 and Falan Exhibit T, Schedule 1 to Exhibit A thereto.

With respect to the intellectual property assets, in the Bill of Sale and Assignment of Collateral in Lieu of Foreclosure executed by the Debtor and GEF on July 7, 2010, the collateral to be transferred to GEF was described in part as follows:

(a) All accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory (as those terms are defined in Article 9 of the Uniform Commercial Code in effect from time to time) wherever located, now and hereafter owned or acquired by CDI; (b) all trademarks, trade names, service marks, logos and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office and all renewals, reissues and extensions thereof (collectively, "Trademarks") and all goodwill created by or associated therewith, whether now owned or hereafter acquired, together with any written agreement granting any right to use any Trademarks' and (c) all proceeds, as that term is defined in Article 9 of the Uniform Commercial Code, all of (a) (b) and (c), to include. . .

(ii) All computer code, computer software and computer programs currently or hereafter in existence of or relating to the internet or television programs and any other programs produced by CDI and all collateral, allied, ancillary, subsidiary and merchandising rights therein, and all properties or things of value pertaining thereto and all products and proceeds thereof whether now in existence or hereafter made, acquired, or produced (as used herein, the term "Programs" shall mean and include the foregoing programs and all of the aforesaid rights, and the rights and property set forth in the subparagraphs (iii) through (xix) below:

(iii) All rights of every kind and nature (including, without limitation, copyrights) in and to any computer code, computer software and computer programs currently or hereafter in existence, literary, dramatic or other material of any kind or nature upon which, in who or in part, the Programs are or may be based, or from which they are, or may be adapted or inspired, or which may be or has been used or included in the Programs including, without limitation, all scripts scenarios, screenplays, bibles, stories, treatments, novels, outlines, books, titles, concepts, manuscripts or other properties or materials of any kind or nature in whatever state of completion and all drafts, versions and variations thereof (collectively, the "Literary Property");

(vi) All collateral, allied, ancillary, subsidiary, publishing and merchandising rights of every kind and nature, without limitation,

      derived from, appurtenant to, or related to the Programs or the Literary Property. . .

  (vii) All rights of every kind or nature, present and future, in and to all agreements relating to the development, production, completion, delivery and exploitation of the Programs. . .

  (xiv) Any and all general intangibles, contract rights, chattel paper documents, investment property, instruments, and goods, including inventory (as those terms are defined in the Colorado Commercial Code), not elsewhere included in this definition, which may arise in connection with the creation, production, completion, delivery, financing, ownership, possession, or exploitation of the Programs.[9]

Similarly, in the letter agreement between Falan and GEF for the acquisition of the Debtor's assets, the assets are described as follows:

 (a) All intellectual property, technology, software programming and applications, trade secrets, secret processes, know-how, procedures, engineering, design, installation, and other technical specifications, working notes and memos, market studies, consultants' reports, technical data, engineering prototypes, and all similar property of any nature, tangible or intangible, relating to the Business [defined as CDI's computer and technology education business, including those which are contemplated at www.videoprofessor.com and www.videoprofessoronline.com];

 (b) All patents, trademarks, trademark registrations, trade names, service marks, copyrights and copyright registrations, websites and domain names, including, without limitation, all rights in an to the use of the phrase "Video Professor;"

 (c) All computer applications software, owned or licensed, whether for general business usage (e.g., accounting, word processing, graphics, spreadsheet analysis, etc.) or specific, unique-to-the-business usage (e.g., order processing, manufacturing, process control, shipping, etc.) and all computer operating, security, or programming software;

 (d) All right, title and interest of Seller [GEF] in and to the goodwill incident to the Business;

---

[9] Jagow Exhibit 8, Bill of Sale and Assignment of Collateral in Lieu of Foreclosure, between Content Distributing, Inc., and GEF, Exhibit A thereto, at A1-A3.

  (e) All CD-ROM inventory and other product inventory which Purchaser [Falan] deems to be usable and saleable in the ordinary course of business;

  (f) All tangible assets, wherever located, including without limitation, all office furniture and cubicles and all equipment and computer hardware that houses the technology owned by, or used in connection with the business by CDI;

  (g) All agreements, leases and contracts deemed to be necessary by the Purchaser;

  (h) All governmental licenses, permits, authorizations and rights (to the extent transferable); and

  (i) All business records, customer lists, advertising materials, promotional displays, publications, surveys and research data, phone numbers, cell phone numbers, fax numbers, and email addresses.[10]

  The parties submitted limited evidence concerning the value of the CD-ROMs, the equipment and furniture, and the Debtor's generator. However this evidence is disputed and is inconclusive. Further, there has been no evidence presented concerning the value of the Debtor's intellectual property. Indeed, no expert witness was presented to testify concerning the value of such property. Moreover, it is unclear how the products now being sold by Falan, under whatever guise, relate to the intellectual property assets transferred by the Debtor and by GEF. The only testimony before the Court, by Mr. Alpert, indicates the current products are improved and updated. It is not clear how or whether such products would relate to the intellectual property transferred by the Debtor, nor at what point such products would lose their "connection" with such intellectual property. Accordingly, it would be improper for the Court to extend the current injunction to include items of such a nebulous nature before a trial on the merits.

  As the Court noted at the evidentiary hearing, the issues of the exact scope of the transfers and the values of the assets are issues for trial. Therefore, Jagow has not met her burden to show a modification of the current preliminary injunction is warranted under this element.

---

[10] Jagow Exhibit 5, pp. 1-2.

**B.      Likelihood of Irreparable Harm If the Expanded Preliminary Injunction Does Not Issue**

With respect to the issue of irreparable harm, the Court finds the evidence shows the scope of the existing preliminary injunction is sufficient.  The maintenance of the status quo was important in the first instance to prevent the dissipation of assets transferred by the Debtor, which assets, or their value, are subject to recovery.  However, the evidence that Falan is creating new or improved products, albeit while using some of the Debtor's intellectual property (for which no value has been established) and is selling those products online using new websites, does not support enjoining those activities.  Specifically, the evidence does not warrant a finding those activities, as opposed to the sale or disposition of the particular assets transferred by the Debtor, will cause irreparable harm to the estate.[11]  If anything, should Jagow prevail on her claims that the proceeds from the new or improved products on the new websites constitute property of the estate, Falan's profits from those products could go towards payment of any judgment in favor of the estate.

In addition, although the current Preliminary Injunction prohibits Falan from disposing of the assets it acquired, Jagow asserts Falan violated that injunction by selling products through other entities and on other websites.  However, the Court notes the evidence does not show the products being sold by any other entities or on other websites directly relate to the assets transferred, primarily because of the as-yet undetermined nature of the intellectual property, which will need to be resolved at trial.  As noted above, any such activity involving property of the estate, once determined at trial, can enable Jagow to obtain a judgment that would benefit the estate.  Therefore, the Court cannot find declining to expand the current preliminary injunction will result in irreparable harm to the estate.

Moreover, while evidence was presented by both sides as to possible misrepresentations by Scherer and Alpert, such evidence does not pertain to the narrow issue of whether the current preliminary injunction should be expanded.

**C.      Whether Injury to the Estate Outweighs Damage the Preliminary Injunction May Cause to Falan**

Alpert testified Falan was formed only to acquire and operate the Debtor's intellectual property.  He admitted Falan has been operating at a loss, but stated if the injunction were expanded, Falan would have no operating funds and would have to cease business.  He also admitted another entity he controls, Danro Corporation, may have obtained the rights to the Video Professor Online domain name, but stated this domain is not currently being used.

---

[11] While Jagow's Exhibit 38 and the testimony of Falan's president, Dan Clarke, reflect Falan's "On Line Professor" web site indicates On Line Professor is the "maker" of Video Professor, such statements do not, in and of themselves, constitute a violation of the current Preliminary Injunction.  The Court makes no finding as to whether they may contribute to the establishment of Jagow's claims at trial.

Dan Clarke, Falan's president, testified Falan had difficulty interesting buyers in the CD-ROM inventory because it was outdated. In addition, he stated when Falan tried to restart the business, it had to replace old systems, rebuild the Debtor's website, and install a new operating system. According to Mr. Clarke, these efforts took two months and approximately $200,000. He further stated onlineprofessor.com is the new website, and Falan has developed eleven new titles so far, while still marketing eighteen Video Professor titles.

Weighing the interests, the Court acknowledges dissipation of assets which, if Jagow is successful, could constitute property of the estate. The Court further recognizes such dissipation could damage the estate. However, the temporary restraining order, which was converted to the Preliminary Injunction, in addition to providing specific restrictions as to the CD-ROM inventory, also orders "Falan Funding shall not sell or otherwise dispose of the Debtor's personal property which Falan Funding asserts it acquired from GEF Services, Inc. on or about July 7, 2010."[12]

To the extent Falan or Alpert has transferred any of these assets to Danro Corporation or any other entity, the Court will order no further transfers may be made absent a Court order. Otherwise, the Court believes the current language of the Preliminary Injunction provides sufficient protection to the estate, without depriving Falan of the ability to do business. Therefore, the Court finds the balance of injury weighs in favor of Falan and against the expansion of the Preliminary Injunction.

### D.     Public Interest

In this case, the prospect of gain or loss for the estate affects the interests of the creditors of the estate. The prospect of significant business constraints affects the interests of Falan and its affiliates and owners. However, no evidence is before the Court regarding the effect on the public interest of an expanded preliminary injunction. Therefore, this element need not be considered in this case.[13]

## CONCLUSION

For the above reasons, the Court finds the extension of the Preliminary Injunction is not appropriate at this time, and it is

---

[12] Court's Temporary Restraining Order of October 26, 2010, at 4, ¶ D (Docket No. 6), converted to the Preliminary Injunction by order on the record at the hearing held November 22, 2011(Docket No. 30).

[13] *See, e.g., Rinard v. Positive Investments, Inc. (In re Rinard)*, 451 B.R. 12, 23 (Bankr. C.D. Cal. 2011) (finding the case was not one where advancement of the public interest was relevant, so the component need not be addressed).

ORDERED Jagow's Motion is DENIED, except as specifically set forth below.

IT IS FURTHER ORDERED the Preliminary Injunction shall remain in effect through and during the trial of this matter and the Court's entry of a final non-appealable order on Jagow's claims.

IT IS FURTHER ORDERED, to the extent the Defendants have transferred any of the subject assets to Danro Corporation or any other entity, no further transfers may be made absent a Court order.

Dated November 2, 2011

BY THE COURT:

Michael E. Romero
U.S. Bankruptcy Judge